IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


MICHAEL WAYNE CORN,
     Petitioner,

vs.                             Case No. 3:08cv199/MCR/EMT

WALTER A. McNEIL,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

       This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 7). Respondent filed an answer and relevant portions of the state court record (Doc. 19). Petitioner filed a reply (Doc. 29).

       The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.     BACKGROUND AND PROCEDURAL HISTORY

       The relevant aspects of the procedural background of this case are undisputed and established by the state court record (*see* Doc. 19, Exhibits; Doc. 29 at 1–2).[1] Petitioner was indicted in the Circuit Court for Santa Rosa County, Florida, on one count of first degree premeditated murder (Ex. B). Following a jury trial, Petitioner was convicted as charged (Ex. C). Petitioner was adjudicated

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (Doc. 19).

guilty and sentenced on September 10, 1999, to life imprisonment without the possibility of parole (*id.*). Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"). The First DCA reversed the conviction and sentence and remanded the case for a new trial. Corn v. State, 796 So. 2d 641 (Fla. 1st DCA 2001).

Petitioner was retried on August 12–15, 2002, and again convicted as charged (Exs. D, E). The trial court again imposed a sentence of life imprisonment without the possibility of parole (Ex. F). Petitioner appealed the judgment to the First DCA. On November 20, 2003, the appellate court affirmed the judgment of conviction per curiam without written opinion, with the mandate issuing December 8, 2003 (Ex. K). Corn v. State, 861 So. 2d 26 (Fla. 1st DCA 2003) (Table). Petitioner did not seek further review by the Florida Supreme Court or the United States Supreme Court.

On January 29, 2004, Petitioner file a petition for writ of habeas corpus in the First DCA alleging ineffective assistance of appellate counsel (Ex. L). The First DCA denied the petition per curiam on the merits on March 11, 2004 (*id.*). Corn v. State, 867 So. 2d 1221 (Fla. 1st DCA 2004).

On or about July 16, 2004, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. M). Petitioner raised twenty-one claims of ineffective assistance of trial counsel, two claims of "newly discovered evidence," and one claim of prosecutorial misconduct (*id.*). On March 28, 2006, the trial court summarily denied all but four of Petitioner's claims and set those four claims for an evidentiary hearing (Exs. P, U). Petitioner was represented by counsel at the evidentiary hearing (*see* Ex. Q). The trial court subsequently denied the remaining claims (Ex. R). Petitioner, through counsel, appealed the trial court's decision to the First DCA, raising one issue (Ex. W). The appellate court affirmed per curiam without written opinion on December 18, 2007, with the mandate issuing January 3, 2008 (Ex. Y). Corn v. State, 969 So. 2d 1019 (Fla. 1st DCA 2007) (Table).

On July 25, 2008, Petitioner filed a habeas petition with the First DCA alleging ineffective assistance of post-conviction appellate counsel (Ex. Z). On September 9, 2008, the First DCA denied the petition per curiam without written opinion (Ex. AA). Corn v. State, 990 So. 2d 1062 (Fla. 1st DCA 2008) (Table).

Prior to filing his second state habeas petition, Petitioner, on May 13, 2008, filed the instant habeas action (Doc. 1). Respondent concedes that the federal petition is timely (Doc. 19 at 5–6).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to"

---

[2] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the

governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion." Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see e.g. Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and

concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* <u>Panetti v. Quarterman</u>, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); <u>Jones</u>, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

III.    EXHAUSTION AND DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[3] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. <u>Duncan</u>, 513 U.S. at 365–66; <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); <u>Picard</u>, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In <u>Picard v. Connor</u>, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to

---

[3]Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
      (A)  the applicant has exhausted the remedies available in the courts of the State; or
      (B) (i)  there is an absence of available State corrective process; or
          (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. *Id.* 459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." Anderson, 459 U.S. at 7 (internal quotation marks omitted). The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim. *Id.*, 459 U.S. at 7 and n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364. The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[4] The Supreme Court explained,"[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed

---

[4] The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal. Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

by the Fourteenth Amendment, he must say so, not only in federal, but in state court." Duncan, 513 U.S. at 365–66. Recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004). The Baldwin Court commented that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" Id., 541 U.S. at 32. With regard to this statement, the Eleventh Circuit stated in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[5]

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review. Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on

---

[5] In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. Id.

the independent and adequate state ground of procedural bar or default.  *See* Coleman v. Thompson, 501 U.S. 722, 734–35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.  Bailey, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar.  *Id.*.  A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question.  *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).  The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[6]  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a

---

[6] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541 (11th Cir. 1994).

claim.  <u>Tower</u>, 7 F.3d at 210; <u>Parker</u>, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  <u>McCleskey v. Zant</u>, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).  Lack of counsel or ignorance of available procedures is not enough to establish cause.  <u>Tower</u>, 7 F.3d at 210.  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  <u>Schlup v. Delo</u>, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  <u>Schlup</u>, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

Within this framework, the court will review Petitioner's claims.

IV.    TRIAL EVIDENCE

Review of the evidence adduced at Petitioner's trial provides a helpful context in considering his claims.  Amanda Andrews testified that Raymond Gray, the victim in this case, was her boyfriend (Ex. D at 170–71)  She testified that Mr. Gray left her home on Thursday, June 19, 1997, at approximately 10:30 p.m. (*id.* at 171–73).

Steven Yonker testified that on June 20, 1997, he was with friends in the vicinity of Coldwater Creek and observed a truck in the creek (*id.* at 175–77).  He testified that one of his friends looked in the truck and saw that the occupant was bleeding badly, so they reported the incident to Jack Jernigan, the chief of the local fire department (*id.* at 177–78).  Mr. Jernigan testified that he dispatched a fire truck to the scene and contacted the Sheriff's Department and an ambulance (*id.* at 179–81).  Jernigan testified that upon his arrival at the scene, he checked the vital signs of the body in the truck, and there were no signs of life (*id.* at 182).  He testified that the body

was on the passenger side of the truck, with its knees on the floorboard and the body slumped over the seat (*id.* at 185). Jernigan testified that while he was in the cab of the truck, he smelled a fairly strong odor similar to gasoline (*id.* at 186). The body was later identified as Raymond Gray.

Everett Stephen Havard, the local medical examiner, testified that Mr. Gray's death was caused by two contact or near-contact gunshot wounds (meaning, the muzzle of the weapon was either against the skin or very close to it) to the left side of his face and to the left side of his chest (*id.* at 220–25). Four .22 caliber long rifle bullets were removed from Mr. Gray's body during the autopsy (*id.* at 226, 231–32). Dr. Havard testified that he observed the smell of gasoline on Mr Gray's body and signs indicating a chemical burn (*id.* at 219, 224–25). Dr. Havard also testified that Mr. Gray had likely been dead for a few hours and possibly as long as a day and a half or two days at the time his body was discovered (*id.* at 226).

Deputy Steve Nesmith testified that shortly after 1:00 a.m. on Saturday, June 21, 1997, he stopped Petitioner's car for erratic driving (*id.* at 244–47, 251). Deputy Nesmith testified that Petitioner was driving the car and was very emotional and upset (*id.* at 247, 251). Nesmith testified that Petitioner "kept stating to the fact that he F-d up, and that his life, basically — it's all over, and there's nothing anybody can do about it." (*id.* at 249). Petitioner was carrying a man's and woman's wedding rings and told Deputy Nesmith that he was having family problems (*id.* at 251–52). Deputy Nesmith testified that he observed the odor of gasoline on Petitioner (*id.* at 247). Deputy Nesmith testified that Deputy Tynes then took over the traffic stop (*id.* at 250). Deputy Tynes testified he did not smell gasoline on Petitioner (*id.* at 255–56). He testified that Petitioner told him he was having family problems and was trying to "get things right" (*id.*).

Alvin Eugene ("Gene") Terrill testified that on the morning of June 20, 1997, Petitioner came to his home and told him, "I think we've killed a son-of-a-bitch." (*id.* at 274–75). Mr. Terrill asked Petitioner if he had brought his son's shotgun (Mr. Terrill stated he had bought his son Phillip a new shotgun), and Petitioner replied yes (*id.* at 276). Petitioner retrieved a gun out of the trunk of his car and carried it into Mr. Terrill's home (Mr. Terrill was sitting outside his home at the time) (*id.*). Petitioner then left Mr. Terrill's home, and Mr. Terrill went inside (*id.* at 276–77). Mr. Terrill saw a gun which he had never seen before in the hallway (*id.* at 277–78). He put the gun behind the

sink (*id.* at 278). Mr. Terrill testified that the next day he heard about Raymond Gray's murder and contacted police, who removed the gun from his home (*id.* at 278–79).

Faye Godwin, a crime scene investigator with the Santa Rosa County Sheriff's Department, testified that she collected a Remington .22 caliber Viper rifle, serial number 3142804, and a clip from Mr. Terrill's home on June 21, 1997 (*id.* at 286–88). She also testified that she recovered four .22 caliber long rifle shell casings from the victim's truck, and observed a bullet hole in the passenger side door of the truck (*id.* at 238, 294). She testified that when she arrived at the crime scene, she smelled a very strong odor of gasoline from the victim's body (*id.* at 241). She testified that she found a lighter on a dirt trail approximately 40–45 feet behind the victim's vehicle (*id.* at 242).

Janice Johnson, a testified that blood spatter on the windshield of Mr. Gray's truck indicated that he was inside the truck on the passenger side when he was shot (*id.* at 616–23).

The parties stipulated to the following testimony of Jack Remus (*id.* at 202, 636–38). Mr. Remus was a laboratory crime analyst with the Florida Department of Law Enforcement in 1997 (*id.*). Remus examined the .22 caliber rifle, serial number 3142804, as well as swabbings of blood from the weapon (*id.*). Using DNA testing procedures, Remus compared the swabbings from the rifle with swabbings from the inside of Mr. Gray's windshield and a known sample of Mr. Gray's blood, and determined that the blood from both of those items was Mr. Gray's (*id.*).

Donald Rawls, a forensic firearms examiner with the State Crime Laboratory, testified that the four cartridge shells recovered from the victim's truck were fired from the Remington .22 caliber long rifle, serial number 3142804 (*id.* at 294, 626–35).

Susan Corn Johnson testified that Petitioner was her ex-husband (*id.* at 594–95). She testified that in December of 1996, she purchased a .22 caliber rifle, serial number 3142804, and kept it at their home (*id.* at 596–98).

Robert Sample, a deputy with the Santa Rosa County Sheriff's Department, testified that he responded to a call for law enforcement at Petitioner's home in January of 1997 (*id.* at 336–37). During the course of his contact with Petitioner, Petitioner showed him a .22 caliber rifle and stated he owned it (*id.* at 338–39). Deputy Sample obtained the serial number of the rifle, which was 3142804 (*id.* at 338).

Tom Gunn, an investigator with the Santa Rosa County Sheriff's Department at the time of Mr. Gray's murder, testified that he went to Gene Terrill's home on the evening of June 21, 1997 (*id.* at 305). Investigator Gunn asked Gene Terrill to attempt to engage Petitioner in a telephone conversation about the rifle, and Terrill agreed (*id.* at 306, 333). With Mr. Terrill's consent, Investigator Gunn monitored and recorded telephone calls from and to Mr. Terrill's telephone from 10:47 p.m. to approximately midnight (*id.* at 306–312). Mr. Terrill eventually made contact with Petitioner, and during their conversation, Mr. Terrill and Petitioner discussed moving the rifle from Mr. Terrill's home (*id.* at 313–15). Investigator Gunn testified that fifteen to twenty minutes after the telephone conversation (in the early morning hours of June 22), officers observed Petitioner's vehicle near Gene Terrill's house (*id.* at 334). Deputy Henry Shirah testified that he stopped the vehicle and observed that Petitioner's wife was driving, and Petitioner and two small children were passengers (*id.* at 259–62). Petitioner was arrested for a misdemeanor and taken to jail, where he agreed to be interviewed (*id.* at 316–19, 334). Law enforcement officers discovered a five-gallon gasoline can containing approximately three and a half gallons of gasoline in the trunk of Petitioner's vehicle (*id.* at 263–64, 291). Investigator Gunn showed Petitioner a picture of the rifle, and Petitioner denied possessing a .22 caliber rifle of any kind (*id.* at 317–21). Petitioner stated he was home all night the night of June 19 (*id.* at 319). Petitioner also denied that he shot and killed the victim; and he terminated the interview with Investigator Gunn (*id.* at 322).

Captain Steve Collier testified that Petitioner lived approximately one and a half to two miles from the location where Raymond Gray's body was found. He also testified that he interviewed Petitioner on June 26, 1997 (*id.* at 349). During the interview, Petitioner stated that on Thursday, June 19, 1997, he and his family went to B.J. Redden's house and swam until midnight and then went home (*id.* at 369–87). He described his activities the next day, on June 20, and did not disclose that he went to Gene Terrill's house (*id.* 387–420). When questioned about being stopped in the early morning hours of June 21, Petitioner stated he and his wife, Susan, had been arguing because she believed that Petitioner was having an affair with B.J. Redden's wife (*id.* at 344). Petitioner stated he and his family drove by Gene Terrill's house in the early morning hours of June 22 to deliver marijuana to Terrill (*id.* at 439, 441, 475). Petitioner again denied owning a .22 caliber rifle and, when shown a picture of the rifle collected from Gene Terrill's home, stated he had never seen

it before (*id.* at 471–72, 501). Petitioner told Captain Collier that he had never heard of Raymond Gray (*id.* at 496). He also told Collier about an incident in which someone shot at his wife, and he complained that a deputy had threatened him (*id.* at 447–50, 452–54, 456–60, 483).

Later on June 26, 1997, Investigator Gunn monitored and recorded another conversation between Gene Terrill and Petitioner, during which Terrill told Petitioner that he had taken the rifle (that Petitioner left at his house) outside to dispose of it, and law enforcement saw him (*id.* at 322–33). Terrill told Petitioner that law enforcement took the rifle and asked him where he obtained it, and he told them to call Petitioner (*id.*). Mr. Terrill told Petitioner he thought law enforcement suspected him (Terrill) of involvement in the murder, and he asked Petitioner to contact law enforcement and tell them he put the rifle in Terrill's house (*id.*). Petitioner responded to Terrill's statements by acting as though Terrill was talking about marijuana and suggesting that someone from the Sheriff's Department had planted the rifle at Terrill's home (*id.*). Petitioner told Terrill not to worry about being investigated for murder because law enforcement "got [sic] other people for that." (*id.* at 331). Petitioner told Terrill that he would "do what I can do" to "straighten it up" with law enforcement; and he told Terrill he would come to his home shortly (*id.* at 332).

Deputy Joe McCurdy testified that he interviewed Petitioner on June 27, 1997 (*id.* at 529). McCurdy asked Petitioner again about the .22 caliber rifle, and Petitioner acknowledged that his wife had purchased the gun (*id.* at 531–32). He stated it had been stolen for approximately two weeks (prior to Raymond Gray's murder) (*id.*). Petitioner told McCurdy that he was having problems with his son's baseball coach, and the coach owned a truck similar to a truck that shot at Petitioner's wife (*id.* at 532–33). Petitioner also discussed his relationship with B.J. Redden's wife, Ellen (*id.* at 533). Petitioner told McCurdy that two weeks prior, he met Ellen Redden near her house on Highway 87, and Petitioner's wife drove up (*id.*). Petitioner also told McCurdy that on the Thursday of the murder while he was at the Redden's home, Ellen Redden told B.J. she had seen someone walking down Highway 87, so B.J. went to look for the "hitchhiker," but returned forty-five minutes later stating he did not find a hitchhiker (*id.* at 533–34).

Detective Craig Brinkerhoff testified that he interviewed Petitioner on August 26, 1997 (*id.* at 573). Petitioner told Deputy Brinkerhoff that his son awakened him one night and told him that B.J. Redden was at the door saying he had hit a dog (*id.* at 579). Petitioner said Redden had blood

on his arms up to his elbows and wanted a lighter (*id.* at 579, 582). Petitioner told Redden he did not have a lighter (*id.* at 579). Petitioner stated that when Redden left, Petitioner saw a truck with a man slumped over in the passenger seat, "flopping around" and bleeding out of his mouth and nose (*id.* at 579–80). Petitioner told Deputy Brinkerhoff that he also saw Phillip Ashby near the road with Redden's truck (*id.*). Petitioner stated that B.J. Redden told him that Phillip Ashby shot Raymond Gray (*id.* at 581–82). Petitioner said that Redden threatened to "burn his family up and throw his kids in the creek" if he said anything (*id.* at 582). When Deputy Brinkerhoff asked Petitioner how his rifle ended up at Gene Terrill's house, Petitioner stated he thought Phillip Ashby stole it from his home (*id.* at 583–84).

Detective Brinkerhoff interviewed Petitioner again on September 10, 1997 (*id.* at 585–86). During that interview, Petitioner stated he thought Raymond Gray was having an affair with his wife, Susan, as well as B.J. Redden's wife (*id.* at 587). He also stated that B.J. Redden discovered the affair and killed Gray (*id.*).

Deputy Joe McCurdy interviewed Petitioner on September 20, 1997 (*id.* at 534). At that time, Petitioner told McCurdy that two weeks prior to the murder, he "traded" the .22 caliber rifle to Gene Terrill and Phillip Ashby for a .12 gauge shotgun (*id.* at 536–37). Petitioner also told McCurdy that Ellen Redden was having an affair with Raymond Gray (*id.* at 537). Petitioner stated that he, B.J. Redden, Gene Terrill, and Phillip Ashby were selling marijuana in the area; and he, Redden, and Ashby were dealing in stolen property (*id.* at 537–38). Petitioner told Deputy McCurdy that when he was at the Redden's house on the afternoon and evening of the murder, there was discussion about Ellen Redden being seen kissing Raymond Gray (*id.* at 538). Petitioner also discussed the hitchhiker story again and stated that when B.J. Redden went to look for the hitchhiker, he took a gun (*id.* at 539). Petitioner told McCurdy that after he and his family left the Reddens' home on the night of the murder, he received a telephone call from B.J. Redden at 3:00 a.m. asking Petitioner to meet him at the creek (*id.* at 539–40). Petitioner told Deputy McCurdy he drove his blue Oldsmobile to the creek (*id.* at 540). When he arrived, B.J. was already there; and Phillip Ashby arrived in a pickup truck (*id.*). Petitioner states B.J. told him he had to "take care of something" and walked to the truck in which Ashby was sitting (*id.*). Petitioner stated he heard yelling and saw B.J. and Phillip outside the truck (*id.*). Petitioner said he saw B.J. point a black rifle

in the window of the truck and begin firing (*id.* at 541). Petitioner told McCurdy that he saw a man in the truck (who Petitioner later identified as Raymond Gray (*see id.* at 556)), and he saw Gray grab the barrel of the rifle and heard B.J. yell, "Let go!" (*id.*, 541, 556). Petitioner said he saw Raymond Gray throw his arms up, but B.J. kept shooting (*id.* at 541). Petitioner stated he heard five shots fired, three rapid shots, a pause, and then two more (*id.* at 556). Petitioner told Deputy McCurdy that he left the scene and drove home (*id.* at 541). He stated that later that night, he heard a knock on his door, and his son told him that it was B.J. (*id.* at 542). Petitioner stated he went to the living room and saw B.J. standing there with blood on his arms (*id.*). Petitioner stated he gave Redden a towel to wipe off the blood, and the two of them walked outside onto the front porch (*id.*). Petitioner told Deputy McCurdy that B.J. asked him for a lighter and a flashlight, but he told Redden he did not have either (*id.* at 543). Petitioner stated that when he went outside with Redden, he saw the truck that Redden had shot into at the creek (*id.*). He saw a boy "flopping around" inside the truck with his head leaned back and blood in his mouth (*id.*). Petitioner told Deputy McCurdy that B.J. Redden threatened to kill his (Petitioner's) son if he told anyone that he saw blood on Redden's arms (*id.* at 543, 548). Redden then drove off in the truck, and Petitioner saw Phillip Ashby drive off in Redden's truck, which was parked near the road (*id.* at 548). Petitioner told Deputy McCurdy that the following morning (June 20, 1997), he ran out of gasoline for his vehicle, so his mother took him to a gas station for gasoline (*id.* at 553). Petitioner then admitted to Deputy McCurdy that he fabricated the story about someone shooting at his wife in order to "throw the police off" (*id.* at 555). Petitioner also stated that his prior statement that the rifle was stolen was false; that he actually "traded" the rifle to Gene Terrill (*id.*).

Ellen Redden testified that on June 19, 1997, Petitioner and his family came to her house for a cookout and swimming (*id.* at 602–03). She testified that her husband, B.J., went to bed before the Corns left and did not leave the house after that (*id.* at 603). Ms. Redden testified that she did not know Raymond Gray or Phillip Ashby in June of 1997 (*id.* at 604).

Phillip Ashby, Gene Terrill's son, testified that in June of 1997, he had never met B.J. Redden, Ellen Redden, or Raymond Gray (*id.* at 609).

Dwayne Gray testified that he was a deputy with the Santa Rosa County Sheriff's Department on September 15, 1999 (*id.* at 645–46). He testified that on that day, he transported

Petitioner and another inmate, Chris Johnson (*id.* at 646–47).  Dwayne Gray testified that he heard Petitioner say, "I shouldn't have shot that boy.  I should have just beat him up." (*id.* at 647–48).

## V.     PETITIONER'S CLAIMS

### A.     Ground One:  "Conviction of Premeditated Murder without Proof of Premeditation Violates Due Process."

In Ground One, Petitioner contends his conviction violated his federal due process rights, as established in Jackson v. Virginia, 443 U.S. 307 (1979), because there was insufficient evidence of premeditation (Doc. 7 at 4, 7–8).

Respondent contends Petitioner failed to fairly present a federal due process claim to the state courts (Doc. 19 at 10–16).  Respondent asserts that although Petitioner challenged the sufficiency of the evidence at trial and on direct appeal, he based his challenges entirely on state law (*id.*).  Respondent acknowledges that in Petitioner's brief on direct appeal, he included a footnote to the very last sentence of the conclusion of his argument, which stated:

> Conviction of premeditated murder without proof of premeditation also violates due process under the fifth and fourteenth amendments to the United States Constitution, and appellant seeks relief on this ground as well.  Jackson v. Virginia, 443 U.S. 307 (1979).

(*see id.* at 13, *see also* Ex. H at 23 n.3).  However, Respondent contends this perfunctory argument did not properly present the federal claim to the state court.  Indeed, the State did not recognize a federal argument in its answer brief but addressed the evidence of premeditation solely as defined by state law; and in Petitioner's reply brief, he did not mention a federal basis for his claim and did not assert that the State failed to address it (Doc. 19 at 13–14).  Respondent contends Petitioner may not return to state court to exhaust this claim because a second appeal is not available (*id.* at 18).  Therefore, the claim is procedurally barred from federal review (*id.*).

Respondent further argues that since this was a circumstantial evidence case, the state appellate court's decision was necessarily based upon application of Florida's circumstantial evidence rule, which is not recognized in the federal due process analysis (*id.* at 16–18).  Therefore, Petitioner is not entitled to relief because federal habeas relief cannot be issued based upon perceived errors of state law (*id.* at 10–11).

As Respondent's final argument, he contends the evidence was sufficient to show premeditation (*id.* at 20–27). Therefore, Petitioner failed to show a federal due process violation (*id.*).

In Petitioner's reply, he argues that the footnote (described *supra*) was sufficient to alert the state court to his federal claim (Doc. 29 at 3–4). Petitioner additionally refutes Respondent's argument that the evidence was sufficient to show premeditation (*id.* at 6–11).

Upon review of the state court record the undersigned concludes that Petitioner's citation to the federal constitutional source of his claim, and to Jackson v. Virginia, 443 U.S. 307 (1979), were sufficient to fairly present his federal claim to the state courts. *Cf.* Isaacs v. Head, 300 F.3d 1232, 1254 (11th Cir. 2002) (single sentence in footnote of petitioner's direct appeal brief, that "[e]rror is, of course, hereby claimed in the failure to record and transcribe same," with no citation to federal case law, was insufficient to alert Georgia Supreme Court that petitioner was asserting federal constitutional claim).

1.      Clearly Established Federal Law

As an issue of federal law, Petitioner's claim derives from the Fourteenth Amendment due process requirement that the evidence presented at trial be sufficient to convict. In determining whether Petitioner's conviction was obtained with constitutionally infirm evidence, reference must be made to the substantive elements of the offense as defined by state law. Jackson v. Virginia, 443 U.S. 307, 324 & n.16, 99 S. Ct. 2781, 2792 n.16, 61 L. Ed. 2d 560 (1979). To satisfy the constitutional requirement of due process during trial, the State must prove beyond a reasonable doubt every fact that constitutes an essential element of the crime charged against the defendant. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed. 2d 368 (1970). When reviewing a claim of insufficient evidence, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a reasonable doubt, but "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (citation omitted). The court should not reweigh the evidence but should view it in the light most favorable to the jury's verdict. *Id.* Because jurors are free to evaluate the credibility of testimony and the weight of the evidence, the court should assume that all conflicting inferences were resolved against the defendant. *Id.* at 326. The test under Jackson is a limited one, and it does not require that the

evidence rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.*; Wilcox v. Ford, 813 F.2d 1140, 1143 (11th Cir. 1987). "The simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant the grant of habeas relief." Wilcox, 813 F.2d at 1143.

In Florida, when the state relies upon purely circumstantial evidence to convict an accused, the evidence must not only be consistent with the defendant's guilt but also inconsistent with any reasonable hypothesis of innocence. Davis v. State, 703 So. 2d 1055, 1059 (Fla. 1997). Even in a purely circumstantial evidence case, the State is not required to rebut conclusively every possible variation of events that could be inferred from the evidence, but only to introduce competent evidence that is inconsistent with the defense's version or theory of events. State v. Law, 559 So. 2d 187, 188–89 (Fla. 1989). However, the federal due process standard does not require the exclusion of any reasonable hypothesis of innocence. *See* United States v. Herrera, 931 F.2d 761, 763 (11th Cir. 1991) (under federal law, it is not necessary that the evidence exclude every reasonable hypotheses of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt) (citations omitted); *see also* Holland v. United States, 348 U.S. 121, 139–40, 75 S. Ct. 127, 137–38, 99 L. Ed. 150 (1954) (rejecting the view that where the Government relies on circumstantial evidence, it must "exclude every reasonable hypotheses other than that of guilt").

2.     Federal Review of State Court Decision

Petitioner raised this claim on direct appeal of his conviction, arguing both that the State failed to produce competent substantial evidence inconsistent with his theory of the events, and that the State's circumstantial evidence failed to prove premeditation (Ex. H at 19–23). Although the First DCA's affirmance of the conviction without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court decision unless review of the record shows that decision to be unreasonable. *See* Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1254–56 (11th Cir. 2002) (holding that a state court decision that does not rest on procedural grounds alone is an adjudication on the merits and, therefore, entitled to deference under the AEDPA, even if the state court decision is not explained in a written opinion, and reviewing

state court's rejection of claim to determine whether it was an unreasonable application of clearly established federal law).

Under Florida law in effect at the time of Petitioner's offense conduct, first degree premeditated murder was defined as the unlawful killing of a human being when perpetrated from a premeditated design to effect the death of the person killed. Fla. Stat. § 782.04(1)(a)(1) (1997). Thus, to prove the crime of first degree premeditated murder, the State was required to prove the following elements beyond a reasonable doubt: (1) the victim, Raymond Gray, is dead, (2) the death was caused by the criminal act of Petitioner, and (3) there was a premeditated killing of Raymond Gray. *See* The Florida Bar 2002 Florida Standard Jury Instructions in Criminal Cases, Fourth Edition, Part Two: Instruction on Crimes, Chapter 7.2 Murder - First Degree (2002) (instruction adopted in 1981 and amended in July 1997). Premeditated killing is defined as killing after consciously deciding to do so. *Id.* The decision must be present in the mind at the time of the killing. *Id.* The law does not fix the exact period of time that must pass between the formation of the premeditated intent to kill and the killing; but the period of time must be long enough to allow reflection by the defendant. *Id.* The premeditated intent to kill must be formed before the killing. *Id.* However, it is sufficient proof of premeditation if the circumstances of the killing and the conduct of the defendant after the killing prove beyond a reasonable doubt the existence of premeditation at the time of the killing. *Id.*

Florida courts have further defined the intent element of first degree premeditated murder:

Premeditation is defined as "a fully-formed conscious purpose to kill, which exists in the mind of the perpetrator for a sufficient length of time to permit of reflection, and in pursuance of which an act of killing ensues." Sireci v. State, 399 So. 2d 964, 967 (Fla. 1981). Premeditation may "be formed in a moment and need only exist 'for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act.'" DeAngelo v. State, 616 So. 2d 440, 441 (Fla. 1993) (quoting Asay v. State, 580 So. 2d 610, 612 (Fla. 1991)). Premeditation can be established by circumstantial evidence. *See* Sireci, 399 So. 2d at 967. As this Court has stated:

Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.

<u>Sochor v. State</u>, 619 So. 2d 285, 288 (Fla. 1993) (quoting <u>Larry v. State</u>, 104 So. 2d
352, 354 (Fla. 1958)).

<u>Blackwood v. State</u>, 777 So. 2d 399, 406 (Fla. 2000).

The evidence admitted at trial from which the jury could infer premeditation included: (1)
the weapon used to kill Mr. Gray was a long rifle, not a pistol or handgun that could easily be carried
on or about the person (thus its possession was not likely to be inadvertent or the result of an
accident, but rather a conscious decision); (2) the rifle was owned by Petitioner's wife and kept in
their home, and Mr. Gray was shot in his vehicle (indicating that a decision had been made—in
advance of the homicide—to remove the rifle from the home and transport it to the location of Mr.
Gray's vehicle); (3) Mr. Gray was on the passenger side of his truck; there were four gunshot
wounds on the left side of his body; and there were four empty bullet casings fired from the murder
weapon inside Mr. Gray's truck (giving rise to the reasonable inference that the murder weapon was
placed and held inside Mr. Gray's vehicle to effectively accomplish the killing); (4) the four gunshot
wounds were contact or near-contact wounds, meaning that the muzzle of the rifle was placed either
against Mr. Gray's skin or very close to it; (5) Mr. Gray was shot in two separate, vital locations of
his body, his face and his chest (thus suggesting a cessation of action long enough to deliberately
acquire a new target area on his body and to ensure that it was a vital area); (6) Petitioner told law
enforcement that there was a pause between the first three gunshots and the last two; and (7)
Petitioner told law enforcement that he believed that his wife was having an affair with Mr. Gray.
This evidence, viewed in a light most favorable to the State, was sufficient to permit a rational juror
to conclude beyond a reasonable doubt that Petitioner consciously decided to kill Raymond Gray
prior to doing so. *See* <u>Larry v. State</u>, 104 So. 2d 352, 354 (Fla. 1958) (evidence of "bad blood"
between victim and defendant, evidence that victim had reputation of carrying considerable sums
of money on his person and defendant had some of victim's money cached in the woods when he
was arrested, brutality of the homicide, and other factors was sufficient to support jury's finding of
premeditation); <u>Corn v. State</u>, 796 So. 2d 641, 642 (Fla. 1st DCA 2001) (evidence of four gunshot
wounds, their location on the victim's body, and the position of the victim's body in the vehicle
when shot was sufficient evidence of premeditation); *see also* <u>Blackwood</u>, *supra* ("Evidence from
which premeditation may be inferred includes such matters as the nature of the weapon used, the

presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.); Berube v. State, 5 So. 3d 734, 744 (Fla. 2d DCA 2009) (sequential or successive acts by the killer directed toward achieving the death of the victim are probative of premeditation); Davis v. State, 922 So. 2d 438, 445 (Fla. 5th DCA 2006) (evidence was sufficient to support first degree premeditated murder conviction where, week before murder, defendant obtained handgun and bullets of same caliber; defendant planned to use handgun as "prop" in robbery; defendant was seen with handgun on night before murder; defendant shot victim at least four times in vital organs at close range; defendant later drove victim's truck to his girlfriend's house, where police caught him; police confiscated $136 and several .380 caliber bullets in defendant's possession, and they recovered murder weapon and victim's cell phone nearby); Millian v. State, 758 So. 2d 1271, 1274–75 (Fla. 4th DCA 2000) (evidence of a pause during a shooting, allowing time for reflection, supports a finding of premeditation); Dupree v. State, 615 So. 2d 713, 718–19 (Fla. 1st DCA 1993) ("The appreciable time between the struggle, the beating, and the strangulation, however small, would be sufficient time for the assailant to reflect upon his actions, and support a jury verdict of premeditated murder."). Since a rational trier of fact could have found guilt beyond a reasonable doubt as to first degree premeditated murder, the undersigned concludes that Petitioner failed to establish that the state court's adjudication of his federal due process claim was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of clearly established Supreme Court law. Therefore, Petitioner is not entitled to federal habeas relief on this claim.

   B.     Ground Two: "Ineffective Assistance of Trial Counsel."

      1.     Sub-claims A through P and R

In sub-claims A through P and R, Petitioner raises seventeen claims of ineffective assistance of trial counsel (Doc. 7 at 4, 9–21). Respondent contends Petitioner raised all of these claims in his Rule 3.850 motion (Doc. 19 at 27–28). The state court granted an evidentiary hearing on some of the claims and summarily denied the remaining claims (id. at 28). Petitioner appealed the trial court's denial of his motion to the First DCA, but presented only one claim in his initial brief on appeal, that is sub-claim Q, infra (id. at 30). Respondent contends Florida law provides that where an evidentiary hearing is held in a Rule 3.850 proceeding, post-conviction claims not included in

the initial brief on appeal are deemed abandoned (*id.* at 28–31). Respondent cites several state cases in support of this position (*id.*; *see also* Doc. 37). Respondent further claims that Petitioner acknowledged that he waived appellate review of these claims in his state habeas petition, in which he stated, under penalty of perjury, that his post-conviction appellate counsel "waived the courts [sic] review of the summarily denied issues of Corn's Motion for Post-Conviction Relief Rule 3.850" (*see* Doc. 19 at 32, Ex. Z). Respondent contends Petitioner cannot now take a second appeal from the denial of his Rule 3.850 motion; therefore, sub-claims A through P and R are procedurally defaulted and procedurally barred from federal review (Doc. 19 at 32–34).

In Petitioner's reply, he contends the state procedural rule relied upon by Respondent is not an adequate state ground to bar federal review of his claims (Doc. 29 at 11–13; *see also* Doc. 42). Petitioner additionally argues that his failure to raise the summarily denied post-conviction claims in his initial brief on appeal was caused by ineffectiveness of his post-conviction appellate counsel (*id.* at 13).

The state court record confirms that Petitioner raised sub-claims A through P and R in his Rule 3.850 motion (Ex. M). The trial court summarily denied some issues and denied the remaining issues after holding an evidentiary hearing (Exs. P, R). In Petitioner's appellate brief, Petitioner's counsel raised only one issue, which was not the issue raised in sub-claims A through P or R of the instant federal petition (Ex. W). The state filed an answer brief addressing only the issue presented in Petitioner's initial brief (Ex. X). The First DCA affirmed the lower court's decision denying Petitioner's Rule 3.850 motion (Ex. Y).

To resolve the exhaustion argument presented by Respondent, the court must determine whether Petitioner properly preserved for appellate review claims that were summarily denied by the post-conviction trial court and not argued by Petitioner in his initial brief on appeal of the trial court's decision. The Florida Rules of Appellate procedure provide that in a case where a movant's Rule 3.850 motion is denied after an evidentiary hearing, a movant wishing to appeal the denial of his motion must file an initial brief. *See* Fla. R. App. P. 9.141(b)(3); *see also* <u>Pennington v. State</u>, 34 So. 3d 151, 153 at n.1 (Fla. 1st DCA 2010) (briefing is required in appeal from non-summary denial of Rule 3.850 motion). It is well established in Florida courts that claims for which an appellant has not presented any argument, or for which he provides only conclusory argument, are

insufficiently presented for review and are waived. *See* <u>Gamble v. State</u>, 877 So. 2d 706 (Fla. 2004); <u>Reed v. State</u>, 875 So. 2d 415 (Fla. 2004) (same); <u>Cooper v. State</u>, 856 So. 2d 969, 977 n.7 (Fla. 2003); <u>Marshall v. State</u>, 854 So. 2d 1235, 1252 (Fla. 2003) <u>Sweet v. State</u>, 810 So. 2d 854, 870 (Fla. 2002); <u>Johnson v. State</u>, 769 So. 2d 990, 1005–06 (Fla. 2000); <u>Shere v. State</u>, 742 So. 2d 215, 217 n.6 (Fla. 1999). The majority of Florida courts—including the First DCA, wherein Petitioner was convicted and pursued relief under Rule 3.850—hold that this rule applies notwithstanding the fact that an evidentiary hearing in a Rule 3.850 proceeding is limited in scope to only some post-conviction claims; thus a movant wishing to preserve any claims for appellate review, whether summarily denied or not, must present argument on those issues in his initial brief. *See* <u>Prince v. State</u>, 40 So. 3d 11 (Fla. 4th DCA 2010); <u>Hammond v. State</u>, 34 So. 3d 58 (Fla. 4th DCA 2010) (claim for which appellant did not present argument, or for which he provided only conclusory argument, was insufficiently presented for appellate review, regardless of whether claim was among those claims litigated at evidentiary hearing or among those claims summarily denied by trial court); <u>Williams v. State</u>, 24 So. 3d 1252 (Fla. 1st DCA 2009) (where appellant received evidentiary hearing on some of his post-conviction claims and others were summarily denied, appellate court would review only those summarily denied claims which movant argued in appellate brief); *see also* <u>Ward v. State</u>, 19 So. 3d 1060, 1061 (Fla. 5th DCA 2009) (en banc) (where all of appellant's post-conviction claims were summarily denied, but appellant chose to file initial brief on appeal (even though not required to do so under Fla R. App. P. 9.141(b)(2)), appellant abandoned any issues not addressed in initial brief); <u>Watson v. State</u>, 975 So. 2d 572 (Fla. 1st DCA 2008) (same); <u>Austin v. State</u>, 968 So. 2d 1049 (Fla. 5th DCA 2007) (same); *but see* <u>Norwood v. State</u>, 30 So. 3d 336 (Fla. 2d DCA 2010) (not applying rule in pro se cases and recognizing conflict with <u>Hammond</u>, <u>Williams</u>, <u>Ward</u>, <u>Watson</u>, and <u>Austin</u>, *supra*); <u>Walton v. State</u>, — So. 3d —, 2010 WL 1507628 (Fla. 2d DCA 2010) (same). While there has not been absolute consistency by Florida district courts of appeal in applying this rule, such is not required to permit a federal court to conclude that a state procedural rule is adequate for federal habeas purposes. *See* <u>Maples v. Allen</u>, 586 F.3d 879, 888 (11th Cir. 2009) (while "regularly followed" means "closely hewn to," it does not mean complete unanimity or absolute consistency of state decisions applying the rule) (citations omitted).

The undersigned thus concludes that the Florida procedural rule deeming as waived or abandoned those claims for which an appellant has not presented any argument in his appellate brief (or for which he provides only conclusory argument), even when the insufficiently presented claims were summarily denied by the trial court, is a firmly established and regularly followed procedural rule for purposes of federal habeas. *See, e.g.*, <u>Ross v. McNeil</u>, 5:07-cv-219-RS-EMT, 2010 WL 2179039 (N.D. Fla. Apr. 14, 2010) (unpublished), *Report and Recommendation adopted*, 2010 WL 2179037 (N.D. Fla. May 28, 2010) (unpublished), *cert. of appealability denied*, No. 10-13013-A (11th Cir. Oct. 4, 2010) (certificate of appealability sought on issue of whether Florida's procedural rule, that defendant waived or abandoned appellate review of post-conviction claims that were summarily denied and not addressed in defendant's appellate brief, where trial court held evidentiary hearing on other claims, was firmly established and regularly followed); <u>Sharp v. McNeil</u>, No. 4:07-cv-17-MP-MD, 2009 WL 981594, at **13–14 (N.D. Fla. Apr. 10, 2009) (unpublished); <u>Durain v. McNeil</u>, No. 2:08-cv-24-FTM-29DNF, 2008 WL 4888989, at *9 (M.D. Fla. Nov. 12, 2008) (unpublished); <u>Williams v. McDonough</u>, No. 8:02-CV-965-T-30MAP, 2007 WL 2330794, at **1–2 (M.D. Fla. Aug. 14, 2007) (unpublished); <u>Walker v. Sec'y, Dep't of Corr.</u>, No. 8:05-cv-1539-T-17MAP, 2007 WL 1747181, at *4 (M.D. Fla. June 18, 2007) (unpublished).[7] Therefore, the undersigned agrees with Respondent's position that Petitioner's sub-claims A through P and R of Ground Two were not exhausted in the state courts. Moreover, Petitioner cannot now take a second appeal from the denial of his Rule 3.850 motion to attempt to successfully exhaust the claims presented in sub-claims A through P and R; therefore, the claims are considered procedurally defaulted.

Petitioner argues that the reason he failed to raise sub-claims A through P and R in his appellate brief in the Rule 3.850 proceeding is that his post-conviction appellate counsel performed ineffectively (*see* Doc. 29 at 13). However, it is well established that there is no constitutional right to an attorney in state post-conviction proceedings; therefore, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings as cause for a procedural

---

[7] The undersigned cites <u>Ross</u>, <u>Sharp</u>, <u>Durain</u>, <u>Williams</u>, and <u>Walker</u> only as persuasive authority and recognizes that the opinions are not considered binding precedent.

default. *See* Coleman, 501 U.S. at 752–53; Maples, 586 F.3d at 891 (citations omitted). Therefore, Petitioner is not entitled to federal review of sub-claims A–P and R.

        2.      Sub-claim Q:  "Ineffective Assistance for Failing to Call Witness."

Petitioner contends his trial counsel performed ineffectively by failing to interview, depose, or present testimony from Chris Johnson (Doc. 7 at 20). Petitioner asserts Chris Johnson would have refuted Deputy Dwayne Gray's testimony that he heard Petitioner tell Johnson, "I shouldn't have shot that boy, I should have just beat him up." (*id.*). Petitioner contends his actual statement to Johnson was, "I would not have shot that boy. I would have beat him up." (Doc. 29 at 15; Doc. 19, Ex. Q at 18).

Respondent concedes that Petitioner exhausted this claim of ineffective assistance of counsel by presenting it in his Rule 3.850 motion and appealing the trial court's denial of the claim to the First DCA (Doc. 19 at 36). However, Respondent contends Petitioner is not entitled to federal habeas relief because he failed to establish that the state court's adjudication of the claim was based upon an unreasonable determination of the facts or was contrary to or an unreasonable application of clearly established federal law (*id.* at 37–41).

        a.      Clearly Established Supreme Court Law

The clearly established federal standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1994). To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. 466 U.S. at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697. Thus, this court need not address the prejudice prong if the court determines that the performance prong is not satisfied. Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir. 2003); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

Pursuant to Strickland, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Strickland, 466 U.S. at 691.

In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Id.* "One of the primary duties defense counsel owes to his client is the duty to prepare himself adequately prior" to a legal proceeding. Lawhorn v. Allen, 519 F.3d 1272, 1295 (11th Cir. 2008) (quoting Magill v. Dugger, 824 F.2d 879, 886 (11th Cir. 1987)). Such preparation includes an understanding of the legal procedures and the legal significance of tactical decisions within those proceedings. Young v. Zant, 677 F.2d 792, 794, 799–800 (11th Cir. 1982) (an attorney's reliance on former law and unawareness of procedure deprived his client of effective assistance). Counsel's decision whether to call a particular witness is a matter of trial strategy entitled to great deference. Chandler, 218 F.3d at 1314 n.14 (citing Waters v. Thomas, 46 F.3d 1506, 1512, 1518–19 (11th Cir. 1995) (en banc)). "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978).[8]

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

As stated by the Eleventh Circuit:

---

[8] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.

No absolute rules dictate what is reasonable performance for lawyers. [citing Strickland, 104 S.Ct. at 2065; other citations omitted]. "Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." Strickland, 104 S. Ct. at 2065; [other citations omitted]. The law must allow for bold and for innovative approaches by trial lawyers. And, the Sixth Amendment is not meant "to improve the quality of legal representation," but "simply to ensure that criminal defendants receive a fair trial." Strickland, 104 S. Ct. at 2065.

Chandler, 218 F.3d at 1307. However, not every strategic decision passes constitutional muster. Whether a particular decision by counsel was a tactical one is a question of fact, Hardwick v. Crosby, 320 F.3d 1127, 1163 (11th Cir. 2003), and the state court's resolution of that issue enjoys a strong presumption of correctness. See 28 U.S.C. § 2254(e)(1); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995); Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991). Whether a particular tactical decision was a reasonable one, however, is a question of law, Hardwick 320 F.3d at 1163; Jackson, 42 F.3d at 1367; Horton, 941 F.2d at 1462. In determining whether counsel's decision was reasonable, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" Id. (quoting Strickland, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome. Strickland, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694. Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. Williams v. Taylor, 529 U.S. at 405–406.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

    b.    Federal Review of State Court Decision

Petitioner raised this ineffective assistance of counsel claim as Issue F, sub-issue A, in his Rule 3.850 motion (Ex. M at 23). The trial court held an evidentiary hearing on this claim, at which Petitioner was represented by counsel (*see* Ex. P at 10–12, Ex. Q at 3–4). Following the evidentiary hearing, the trial court denied Petitioner's post-conviction motion (Ex. R). That decision was affirmed by the First DCA (Ex. Y). While the affirmance was a per curiam opinion without reasoning, this court presumes that the First DCA's decision affirms the reasoning, as well as the judgment of the circuit court. "'Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.'" Sweet v. Sec'y Dept. of Corr., 467 F.3d 1311, 1316–17 (11th Cir. 2006) (quoting Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594, 115 L. Ed. 2d 706 (1991)); *see also* Harmon v. Barton, 894 F.2d 1268, 1273 (11th Cir. 1990) (noting that the "clear inference" to be drawn from a per curiam affirmance without written opinion is that the appellate court "accepted not only the judgment but the reasoning of the trial court.").

In the trial court's written opinion denying Petitioner's claim, the court identified the Strickland standard as the controlling legal standard for analyzing claims of ineffective assistance of counsel (Ex. R). Because the state court correctly identified Strickland as the governing precedent, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable determination of the facts or that the state court decision was an unreasonable application of Strickland.

The trial court found as fact that Petitioner's trial counsel, Attorney Spiro Kypreos, testified that he had attempted to arrange a pre-trial telephone deposition of Chris Johnson; however, prison officials informed him that Johnson had mental health issues and was unable to testify (Ex. R at 2–3). The trial court found that Attorney Kypreos further testified that he did not seek a continuance

of trial to secure Johnson's deposition because he had no proof to offer to the court as to what Johnson's testimony might be and thus lacked a basis to request a continuance (*id.* at 3).  The trial court found that Attorney Kypreos noted that Petitioner informed him of his (Petitioner's) version of what Johnson might say, but Kypreos believed there was a risk that Johnson's testimony might support Deputy Gray's testimony (*id.*).  The trial court additionally found as fact that Petitioner did not offer any evidence to support his assertion as to the content of Chris Johnson's testimony; for example, Petitioner did not call Johnson as a witness at the evidentiary hearing, nor did he present any other evidence that Johnson would have contradicted Deputy Gray's testimony (*id.* at 3).  Based upon these factual findings, the court concluded that Petitioner failed to demonstrate that Attorney Kypreos performed deficiently by failing to call Chris Johnson as a witness at trial to impeach Deputy Gray's testimony (*id.*).

When a habeas claim is based upon the testimony of a putative witness, the petitioner must generally present evidence in "the form of actual testimony by the witness or on affidavit.  A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim."  United States v. Ashimi, 932 F.2d 643, 650 (7th Cir. 1991) (footnotes omitted)); *see also* United States v. Schaflander, 743 F.2d 714, 721 (9th Cir. 1984) (to succeed on claim of ineffective assistance of counsel based upon counsel's failure to investigate or interview potential witnesses, petitioner must make sufficient factual showing substantiating testimony of proposed witnesses, for example, affidavits or sworn statements).

In the instant case,  Petitioner's assertion that Chris Johnson would have impeached Deputy Gray's testimony is based purely on Petitioner's self-serving speculation.  He failed to present, either to the state court or this court, testimony from Mr. Johnson, a sworn affidavit from Mr. Johnson stating what his trial testimony would have been, or any other proof substantiating Petitioner's speculation as to the content of Mr. Johnson's proposed testimony.  Petitioner's allegations are thus insufficient to show that Attorney Kypreos performed ineffectively by failing to interview him, depose him, or call him as a trial witness.  Therefore, the state court's denial of Petitioner's claim was not an unreasonable application of Strickland.

C.      Ground Three:  "Prosecutorial Misconduct."

Petitioner contends the prosecutor engaged in misconduct by failing to recall the grand jury when he discovered that some of the evidence presented during the grand jury proceeding was false and misleading (Doc. 7 at 5, 21–22). Petitioner states the prosecutor presented the grand jury with the following evidence: (1) the victim, Raymond Gray, was last seen on June 19, 1997, at 10:00 p.m.; (2) the body of the victim was discovered doused with gasoline on June 20, 1997; (3) Petitioner was stopped by law enforcement on June 20, 1997, only a few miles from the location of the victim's body and had a strong odor of gasoline on his person; (4) Petitioner's vehicle had high velocity blood "splatter" on it; and (5) a paint chip discovered on the victim's nose was blue, the same color as Petitioner's vehicle (*id.* at 21–22). Petitioner asserts that after pre-trial investigation, the following evidence was revealed: (1) Petitioner was stopped on June 21, not June 20; (2) the substance splattered on Petitioner's vehicle was not blood; and (3) the paint chip on the victim's nose was green, not blue (*id.* at 22). Petitioner contends the prosecutor should have recalled the grand jury upon discovering this information, instead of proceeding with the indictment (*id.*).

Respondent contends, based upon two independent grounds, that Petitioner failed to exhaust this claim in the state courts. First, the post-conviction trial court denied the claim as procedurally barred and legally insufficient under Florida law (Doc. 19 at 41–43). Second, Petitioner failed to brief this issue in his initial brief on appeal of the trial court's denial of his Rule 3.850 motion (*id.* at Doc. 19 at 42–44). Respondent contends Petitioner cannot return to state court to litigate the claim under state procedural rules; therefore, the claim is procedurally barred from federal review (*id.* at 44). Moreover, Respondent argues, Petitioner has not established cause for the failure to raise the claim in his initial brief on appeal; therefore, he is not entitled to federal review of his claim (*id.* at 44–45).

In Petitioner's reply brief, he contends the state court opinion did not rely upon a procedural bar; and even if it did, it renders his claim technically exhausted (Doc. 29 at 17). Petitioner additionally contends he is entitled to relief on this claim because he has shown a due process violation pursuant to United States v. Basurto, 497 F.2d 781 (9th Cir. 1974) (*id.* at 18).[9]

---

[9] In Basurto, the Ninth Circuit held that the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. 497 F.2d at 785–86.

The state court record shows that Petitioner raised this claim of prosecutorial misconduct as Ground III of his Rule 3.850 motion (Ex. M at 65–67). The trial court reviewed the record and determined that the notes, testimony, and materials which were the product of the grand jury presentation remained sealed; therefore, Petitioner had no actual knowledge to attack the sufficiency or validity of the evidence presented by the prosecutor to the grand jury (Ex. P at 26). The court therefore denied the claim as legally insufficient (*id.*). Petitioner did not present argument on this issue in his initial brief on appeal (*see* Ex. W).

For reasons stated in this court's discussion of Ground Two, sub-claims A through P and R, *supra*, the undersigned concludes that Petitioner failed to exhaust his claim of prosecutorial misconduct by virtue of his failure to present argument on the issue in his initial brief on appeal of the trial court's denial of his Rule 3.850 motion. Furthermore, Petitioner cannot now take a second appeal from the denial of his Rule 3.850 motion to attempt to successfully exhaust the claim presented in Ground Three; therefore, the claim is considered procedurally defaulted. Moreover, to the extent Petitioner asserts ineffective assistance of post-conviction appellate counsel as cause for the procedural default, this argument has been rejected by the Supreme Court and the Eleventh Circuit, as discussed *supra*. *See* Coleman, 501 U.S. at 752–53; Maples, 586 F.3d at 891 (citations omitted). Therefore, Petitioner is not entitled to federal review of this claim.

D.     Ground Four: "Ineffective Assistance of Appellate Counsel."

1.     Sub-claim A: "Appellate Counsel's Ineffective [sic] by Failing to Raise Counsel Ineffective [sic] by Failing to Object to Prosecutor Misconduct Where in Closing He Commented on Petitioner's Right to Remain Silent and Failure to Call Witnesses."

Petitioner contends he received ineffective assistance of counsel on direct appeal of his conviction because counsel failed to raise an issue of ineffective assistance of trial counsel based upon trial counsel's failure to object to improper statements by the prosecutor during closing argument (Doc. 7 at 23).

Respondent concedes that Petitioner exhausted this claim of ineffective assistance of appellate counsel by presenting it as Issue II in his state habeas petition (Doc. 19 at 46–47). However, Respondent contends Petitioner is not entitled to federal habeas relief because he failed to establish that the First DCA's denial of his claim was contrary to or an unreasonable application of Strickland (*id.* at 47–52).

a.      Clearly Established Federal Law

The proper standard for evaluating a claim of ineffective assistance of appellate counsel is the <u>Strickland</u> standard.  *See* <u>Smith v. Robbins</u>, 528 U.S. 259, 285,120 S. Ct. 746, 764, 145 L. Ed. 2d 746 (2000) (citation omitted).  The two components of an ineffectiveness claim under <u>Strickland</u> are performance and prejudice, and if an insufficient showing is made as to one, the court need not address the other.  <u>Strickland</u>, 466 U.S. at 697.  The focus of inquiry under the performance prong of the <u>Strickland</u> standard is whether counsel's assistance was "reasonable considering all the circumstances." *Id.* at 691.  Appellate counsel who file a merits brief need not (and should not) raise every nonfrivolous claim but, rather, may select from among them in order to maximize the likelihood of success of on appeal.  <u>Jones v. Barnes</u>, 463 U.S. 745, 753–54, 103 S. Ct. 3308, 3314, 77 L. Ed. 2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.").  To demonstrate prejudice, Petitioner must show a reasonable probability that, but for his counsel's unreasonable failure to brief a particular issue, Petitioner would have prevailed on appeal.  *See* <u>Robbins</u>, 528 U.S. at 285.

The Eleventh Circuit has issued several decisions interpreting the <u>Strickland</u> standard with regard to claims of ineffective assistance of appellate counsel.  Appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit."  <u>United States v. Nyhuis</u>, 211 F.3d 1340, 1344 (11th Cir. 2000) (quoting <u>Alvord v. Wainwright</u>, 725 F.2d 1282, 1291 (11th Cir. 1984)).  Additionally, where an issue is not preserved for appellate review, appellate counsel's failure to raise the issue is not constitutionally deficient as it is based on the reasonable conclusion that the appellate court will not hear the issue on its merits.  <u>Diaz v. Sec'y Dep't of Corrs.</u>, 402 F.3d 1136, 1142 (11th Cir. 2005); <u>Atkins v. Singletary</u>, 965 F.2d 952, 957 (11th Cir. 1992); <u>Francois v. Wainwright</u>, 741 F.2d 1275, 1285–86 (11th Cir. 1984).  Moreover, the arguments omitted from the appeal must have been significant enough to have affected the outcome of the appeal.  <u>Nyhuis</u>, 211 F.3d at 1344 (citing <u>Miller v. Dugger</u>, 858 F.2d 1536, 1538 (11th Cir. 1988)).

b.      Federal Review of State Court Decision

Petitioner raised this claim of ineffective assistance of appellate counsel as Issue II in his state habeas petition (Ex. L at 8–11).  The First DCA denied the petition on the merits (Ex. L).  The

First DCA did not cite Strickland; however, a state court need not cite to, nor even be aware of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002).

To the extent Petitioner argues appellate counsel should have raised a claim of ineffective assistance of trial counsel, the First DCA's denial of the claim was not unreasonable. Florida law is well-settled that claims of ineffective assistance of trial counsel are not, except under limited circumstances, cognizable on direct appeal.

> As to whether the issue of adequacy of representation can be raised for the first time on appeal, we hold that it cannot properly be raised for the first time on direct appeal, since, as was recognized in [Chester v. State, 276 So. 2d 76 (Fla. 2d DCA 1973)], "it is a matter that has not previously been ruled upon by the trial court." An appellate court must confine itself to a review of only those questions which were before the trial court and upon which a ruling adverse to the appealing party was made.

State v. Barber, 301 So. 2d 7, 9 (Fla. 1974); *see also* Johnston v. State, 841 So. 2d 349 (Fla. 2003) (claim that trial counsel was ineffective should have been raised in postconviction proceeding). The proper procedural vehicle for an ineffective assistance of trial counsel claim is a Rule 3.850 motion. *See* Blanco v. Wainwright, 507 So. 2d 1377, 1384 (Fla. 1987); Barber, 301 So.2d at 9 ("3.850 provides a means by which this issue may properly be resolved in a correct procedural setting in the trial court where evidence may be taken.").

There are, however, "rare exceptions where appellate counsel may successfully raise the issue on direct appeal because the ineffectiveness is apparent on the face of the record and it would be a waste of judicial resources to require the trial court to address the issue." Blanco, 507 So. 2d at 1384; *see also* Wuornos v. State, 676 So.2d 972, 974 (Fla. 1996) (ineffective assistance of counsel claim not cognizable on direct appeal, only by collateral challenge); Thompson v. State, 764 So. 2d 630 (Fla. 1st DCA 2000). The existence of "rare exceptions," however, does not render appellate counsel's failure to raise issues of ineffective assistance of trial counsel deficient performance. *See* Blanco, 507 So. 2d at 1384 ("A proper and more effective remedy is already available for ineffective assistance of trial counsel under rule 3.850. If the issue is raised on direct appeal, it will not be cognizable on collateral review. Appellate counsel cannot be faulted for preserving the more effective remedy and eschewing the less effective."). Therefore, Petitioner failed to show that appellate counsel's failure to raise a claim of ineffective assistance of trial

counsel was a decision that no competent counsel would have made. Accordingly, the First DCA's denial of Petitioner's claims of ineffective assistance of appellate counsel was not an unreasonable application of Strickland.

Additionally, to the extent Petitioner claims that appellate counsel was ineffective for failing to raise the issue of prosecutorial misconduct notwithstanding trial counsel's failure to preserve it below, he failed to satisfy Strickland. In Florida, a claim of prosecutorial misconduct based upon improper comments during closing arguments must generally first be raised in the trial court to be preserved for appellate review. *See* Brooks v. State, 762 So. 2d 879 (Fla. 2000) (as a general rule, failing to raise a contemporaneous objection when improper closing argument comments are made waives any claim concerning such comments for appellate review); Allen v. State, 662 So. 2d 323, 328 (Fla. 1995) (to preserve allegedly improper prosecutorial comment in closing argument for appellate review, defendant must object to comment and move for mistrial) (citing Parker v. State, 456 So. 2d 436, 443 (Fla. 1984)). It is clear from the trial record that Petitioner's trial counsel did not preserve the claim of prosecutorial misconduct based upon improper comments during closing arguments (*see* Ex. D at 729, 731–72, 736–37, 777, 790–91). In light trial counsel's failure to preserve the issue for appellate review, appellate counsel's failure to raise the issue was not constitutionally deficient. *See* Diaz, 402 F.3d at 1142; Atkins, 965 F.2d at 957; Francois, 741 F.2d at 1285–86.

        2.      Sub-claim B: "Counsel Ineffective [sic] for Failing to Raise on Appeal the Court Erred in Instructing the Jury with the Principle [sic] Instruction without Evidence to Support the Instruction."

Petitioner contends he was indicted for committing first degree murder; and the State pursued only the theory that he was the perpetrator (Doc. 7 at 24). He states the State did not present evidence suggesting either that another person assisted him in commission of the crime, or that he assisted another person (*id.*). Furthermore, Petitioner contends the indictment did not charge him based upon a principal theory of liability (*id.*). Petitioner asserts defense counsel objected to the State's request for a jury instruction on principal liability, thereby properly presenting the issue for appeal; however, appellate counsel failed to raise it (*id.*).

Respondent concedes that Petitioner exhausted this claim of ineffective assistance of appellate counsel by presenting it as Issue III in his state habeas petition (Doc. 19 at 52). However,

Respondent contends, Petitioner is not entitled to federal habeas relief because he failed to establish that the First DCA's denial of his claim was contrary to or an unreasonable application of Strickland (*id.* at 52–56).

### a. Clearly Established Federal Law

The proper standard for evaluating a claim of ineffective assistance of appellate counsel is set forth *supra*.

### b. Federal Review of State Court Decision

Petitioner raised this claim as Issue III in his state habeas petition (Ex. L at 12–19). As previously noted, the First DCA denied the petition on the merits (*id.*).

The record demonstrates that Petitioner's trial counsel preserved this issue for appeal by objecting to the jury instruction regarding principal liability on the ground that there was no evidence adduced at trial to support it (Ex. D at 703–11). Petitioner's appellate counsel filed a merits brief raising three issues, none of which was a claim of trial court error based upon giving the principal instruction (Ex. H).[10]

Petitioner failed to show that this issue was stronger than those raised by appellate counsel. To support a principal instruction, Florida law requires that there be some evidence adduced at trial to support an aiding and abetting theory of guilt. *See* Lewis v. State, 693 So. 2d 1055, 1057–58 (Fla. 4th DCA 1997). The trial record in the instant case shows that evidence was adduced at Petitioner's trial which suggested he aided and abetted another in the killing of Raymond Gray, including Petitioner's statement to law enforcement that he and Phillip Ashby were present when B.J. Redden shot the victim, Petitioner's statement to law enforcement that B.J. Redden told him Phillip Ashby actually shot the victim, the fact that Petitioner owned the murder weapon, Gene Terrill's testimony that Petitioner brought the murder weapon to his (Terrill's) home after the murder, and Gene Terrill's testimony that Petitioner told him, "I think we've killed a son-of-a-bitch."

Furthermore, the standard of review for claims of trial court error with respect to jury instructions is abuse of discretion:

---

[10] Petitioner's appellate counsel raised the following three issues: (1) the trial court erred in admitting evidence of Petitioner's emotional statements made after a traffic stop on June 21, because there was no evidence of a nexus to the murder; (2) the trial court erred in sustaining the State's objection to defense counsel's proper cross-examination of Susan Johnson; and (3) the evidence was insufficient to prove the premeditation element of premeditated murder (Ex. H).

> Discretion . . . is abused when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion.

Canakaris v. Canakaris, 382 So. 2d 1197 (Fla. 1980) (internal quotation marks omitted). In light of this high standard of review, as well as the evidence presented from which the jury could reasonably infer that Petitioner aided and abetted another in the premeditated murder of Raymond Gray, Petitioner failed to show a reasonable probability of success on appeal if counsel had raised this issue of trial court error. Therefore, Petitioner failed to demonstrate that the First DCA's denial of this claim was an unreasonable application of Strickland.

> 3. Sub-claim C: "Appellate Counsel Ineffective [sic] for Failing to Raise on Appeal that Petitioner's Due Process Rights Violated [sic] when the Court Instructed the Jury with the Principle [sic] Theory when the Indictment Failed to Allege or Charge that Theory and Petitioner was the Only Person Charged with Crime."

Petitioner contends the indictment charged him as the perpetrator of the murder, not as a principal (Doc. 7 at 25). He states defense counsel objected to the jury instruction on principal liability on the ground that it violated Petitioner's due process rights because the indictment did not allege a principal theory (id.). Petitioner contends appellate counsel was ineffective for failing to raise this issue on appeal (id.).

Respondent concedes that Petitioner exhausted this claim of ineffective assistance of appellate counsel by presenting it as Issue IV in his state habeas petition (Doc. 19 at 56–57). However, in Issue IV of the state petition, Petitioner argued that appellate counsel should have raised a different due process issue than that preserved by defense counsel at trial. Respondent contends appellate counsel was not ineffective for failing to raise an unpreserved issue; therefore, Petitioner failed to establish that the First DCA's denial of his ineffective assistance of appellate counsel claim was contrary to or an unreasonable application of Strickland (id. at 57–62).

> a. Clearly Established Federal Law

The proper standard for evaluating a claim of ineffective assistance of appellate counsel is set forth *supra*.

> b. Federal Review of State Court Decision

In Petitioner's reply, he expounds on the due process issue which he contends counsel should have raised on direct appeal, which is the same issue he argued in his state habeas petition, that is, the jury was instructed they could convict Petitioner of aiding and abetting another person's commission of the murder, even though Petitioner had no notice that the State was proceeding on that theory and, therefore, was unable to prepare a defense (Doc. 29 at 27–30; *see also* Ex. L at 19–24). The First DCA denied the petition alleging ineffective assistance of appellate counsel on the merits (Ex. L).

The record demonstrates that the due process issue preserved by Petitioner's trial counsel was that the jury instruction violated the due process principles established in Apprendi v. New Jersey, 530 U.S. 466 (2000) and Ring v. Arizona, 536 U.S. 584 (2002) (Ex. D at 702–03). In Apprendi v. New Jersey, the Supreme Court held that other than the fact of a prior conviction, any fact that increases the penalty for the crime beyond prescribed statutory maximum must be submitted to jury and proved beyond reasonable doubt. 530 U.S. at 490. In Ring, the Supreme Court held that a sentencing judge, sitting without a jury, may not find an aggravating circumstance necessary for the imposition of the death penalty; rather, those circumstances must be found by a jury." 536 U.S. at 609.

Petitioner failed to show a reasonable probability that the issue preserved by defense counsel would have been successful on appeal. The nature of Petitioner's role as either a principal or the perpetrator exposed him to the same maximum penalty for first degree premeditated murder under Florida law. *See* Fla. Stat. § 777.011 (1997) ("Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense."). Therefore, appellate counsel was not deficient for failing to raise the due process issue preserved by Petitioner's trial counsel. Moreover, as previously discussed, where an issue is not preserved for appellate review, appellate counsel's failure to raise the issue is not constitutionally deficient as it is based on the reasonable conclusion that the appellate court will not hear the issue on its merits. *See* Diaz, 402 F.3d at 1142; Atkins, 965 F.2d at 957; Francois, 741 F.2d at 1285–86. Therefore, Petitioner's

contention that appellate counsel was deficient for failing to raise a due process claim other than the Apprendi and Ring issue preserved by his trial counsel was not constitutionally deficient. Accordingly, the First DCA's denial of this claim was not an unreasonable application of Strickland.

    4.    Sub-claim D: "Appellate Counsel Ineffective [sic] by Failing to Raise on Appeal that the Principle [sic] Instruction Constructively Amended the Grand Juries [sic] Indictment."

Petitioner contends the trial court erred in instructing the jury on principal liability because it constituted a constructive amendment of the indictment (Doc. 7 at 26).

Respondent concedes that Petitioner exhausted this claim of ineffective assistance of appellate counsel by presenting it as Issue V in his state habeas petition (Doc. 19 at 63). However, this issue was not preserved by defense counsel at trial, therefore, Respondent contends, appellate counsel was not ineffective for failing to raise it (*id.* at 63–65).

    a.    Clearly Established Federal Law

The proper standard for evaluating a claim of ineffective assistance of appellate counsel is set forth *supra*.

    b.    Federal Review of State Court Decision

Petitioner raised this claim as Issue V in his state habeas petition alleging ineffective assistance of appellate counsel (Ex. L at 25–27). The First DCA denied the petition on the merits (Ex. L).

The trial transcript demonstrates that defense counsel did not preserve this issue for appeal. Defense counsel objected to the jury instruction on principal liability only on the following two grounds: (1) the instruction violated Apprendi and Ring, and (2) there was no evidence adduced at trial to support the instruction (Ex. D at 702–11). As previously discussed, appellate counsel's failure to raise an unpreserved issue is not constitutionally deficient; therefore, the First DCA's denial of this claim was not an unreasonable application of Strickland.

## VI.   CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing

required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1. That the amended petition for writ of habeas corpus (Doc. 7) be **DENIED**.

2. That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 24th day of November 2010.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon the magistrate judge and all other parties. Failure to object may limit the scope of appellate review of factual findings.** *See* **28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**